**IN THE COURT OF APPEALS OF IOWA**

No. 22-1456
Filed March 8, 2023

**IN THE INTEREST OF K.A.,**
**Minor Child,**

**M.W., Mother,**
        Petitioner-Appellee,

**A.A., Father,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Phillip J. Tabor, District

Associate Judge.


        A father appeals the termination of his parental rights under Iowa Code

chapter 600A (2021). **REVERSED AND REMANDED.**


        Arthur L. Buzzell, Bettendorf, for appellant father.

        Jennifer Margaret Triner Olsen of Olsen Law Firm, Davenport, for appellee

mother.

        Paul Lyle Macek of Hopkins & Huebner P.C., Davenport, attorney and

guardian ad litem for minor child.


        Considered by Vaitheswaran, P.J., and Ahlers and Buller, JJ. Tabor, J.,

takes no part.

**VAITHESWARAN, Presiding Judge.**

A mother filed a petition to terminate the father's parental rights to a child born in 2017. *See* Iowa Code chapter 600A (2021). She alleged the father abandoned the child. The district court granted the petition. On appeal, the father contends his conduct "negated a finding of abandonment," as did the mother's conduct in "diverting district court jurisdiction to the exclusive jurisdiction of [the] juvenile court."

The case is complicated by the existence of three separate actions involving the child: (1) a petition to establish custody and support filed in December 2017; (2) a petition for relief from domestic abuse filed in July 2019; and (3) the petition to terminate the father's parental rights underlying this appeal and filed in July 2021. In terminating the father's parental rights, the district court considered the previous two actions. We will begin with the orders in those actions

**2017 Custody Petition.** The district court filed a temporary order requiring the father to pay child support. The order did not provide for visits. By agreement, the father saw the child on a weekly basis for well over a year. The father also complied with his support obligation. Following an evidentiary hearing, the district court granted the mother sole legal custody and temporary physical care and disallowed any visits between the father and child until the father underwent a psychiatric evaluation. The court cited "a history of domestic abuse" perpetrated by the father on the mother. The order was filed on September 19, 2019.

The father obtained a psychiatric evaluation, and he moved to modify the September 19, 2019 order. On April 15, 2020, the district court denied the motion to reconsider the September 19, 2019 order. The 2020 order reaffirming the 2019

order effectively precluded the father from exercising visitation with his child. The case did not proceed to a final evidentiary hearing.

**2019 Domestic Abuse Petition.** The district court entered a temporary protective order in favor of the mother. The order, filed on July 16, 2019, contained a provision granting the mother temporary custody of the child. The order did not provide for visitation.

One month after the order was filed, the father moved for temporary visitation. He noted that the mother was "not allowing any unsupervised visitation" with the child. The district court ordered supervised visitation. The mother testified the father attended visits "[e]very other weekend and Wednesdays."

On September 11, 2020, the mother moved for an extension of the protective order. The district court granted the motion. A second extension was also granted, which was in place at the time of trial in the termination action. Neither of the extension orders said anything about visitation.

**Termination Petition Filed in 2021.** The termination petition was tried in 2022. As noted, the district court granted the petition on a single ground: abandonment. We turn to the elements of that statutory provision.

"To abandon a minor child" is defined as rejection of "the duties imposed by the parent-child relationship, . . . which may be evinced by the person, *while being able to do so*, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." Iowa Code § 600A.2(20) (emphasis added).

[A] parent is deemed to have abandoned a child as follows:

. . . .

b. If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:

(1) Visiting the child at least monthly *when physically* and financially *able to do so* and when not prevented from doing so by the person having lawful custody of the child.

(2) Regular communication with the child or with the person having the care or custody of the child, *when physically* and financially *unable to visit the child* or when prevented from visiting the child by the person having lawful custody of the child.

. . . .

*Id.* § 600A.8(3)(b) (emphasis added). The definition requires a showing that the parent contributed to support of the child, visited the child "when physically . . . able to do so" or "[r]egular[ly] communicat[ed] with the child . . . when physically . . . unable to visit the child."

As a preliminary matter, we do not quarrel with the district court's findings that the father domestically abused the mother. But, as egregious as his conduct was, the question before the district court in this proceeding was solely whether "the child's father . . . abandoned the child within the scope and meaning of Iowa Code [s]ection 600A.8(3), (b), (1), (2)."

It is undisputed that the father paid child support continuously and in the amount ordered by the custody court. It is also undisputed that the father visited the child "[w]eekly" following entry of the temporary support order. And it is undisputed that the district court ordered the mother to afford the father supervised visits following entry of the 2019 domestic abuse protective order. As a result, the

father saw the child consistently from the time of his birth until he was two months shy of his second birthday. That changed in September 2019, when the district court disallowed visits pending the father's completion of a psychiatric evaluation.

After the father obtained the psychiatric evaluation and the district court found it insufficient to reinstate visits, the father obtained two additional psychiatric evaluations. He also saw a licensed social worker for counseling, participated in in-home family services counseling, and obtained neuropsychological testing. *Cf. In re G.D.*, No. 20-0984, 2021 WL 2126174, at *4 (Iowa Ct. App. May 26, 2021) ("The father did nothing to seek modification of the protective order to reassert visitation rights."); *In re K.K.*, No. 20-0816, 2021 WL 210746, at *1 (Iowa Ct. App. Jan. 21, 2021) ("[T]he father offers no evidence that he tried to arrange visits or contact the child" following issuance of a protective order, "such as pursuing legal options to re-institute visits."); *In re K.M.*, No. 14-1374, 2015 WL 1849508, at *5 (Iowa Ct. App. Apr. 22, 2015) ("[I]t was necessary for the father to make efforts to maintain contact with K.M.—even with the no-contact order in place—rather than completely relinquish all parental rights and duties."); *In re A.K.*, No. 10-0160, 2010 WL 2598252, at *2 (Iowa Ct. App. June 30, 2010) ("The fact that [the mother] sought and obtained extensions of the protective order, as was her right, did not prevent [the father] from seeking court permission to provide monetary support or have written or supervised contact with his daughter. He did not seek this permission even after a district court judge and one of his attorneys informed him of his options."). The custody court had no opportunity to consider these efforts because, as the father explained, the termination petition was filed "on the eve of" trial in the custody matter, divesting the district court of jurisdiction.

In sum, the father maintained contact with the child until the September 2019 order barring visitation, sought reconsideration of the September 2019 order, and attempted to comply with conditions for reinstatement of visits. Unlike the cited opinions in which abandonment was found, the father had a relationship with the child and attempted to maintain that relationship. The September 19 order together with the April 2020 order reaffirming it precluded him from doing so.

On our de novo review, we conclude the father was "physically unable" to visit the child as required by Iowa Code section 600A.8(3)(b)(1). *Cf. In re M.K.*, No. 22-0467, 2022 WL 17829353, at *3 (Iowa Ct. App. Dec. 21, 2022) ("Even before [the mother's] assaultive behavior prompting the protective order, [the mother] failed to assume the duties expected of a parent."). The father also was unable to communicate with the child through means other than in-person visits, as phone contacts violated the domestic abuse protective orders.[1] The mother failed to prove abandonment under Iowa Code section 600A.8(3)(b). *See In re A.V.*, No. 16-0480, 2016 WL 6637666, at *4 (Iowa Ct. App. Nov. 9, 2016) ("Given the existence of the protective order, the father's attempts to reestablish contact with the children, and the district court's persistent denial of a hearing on the issue of visitation, we cannot find the father abandoned his children."); *In re E.M.O.*, No. 11-0965, 2011 WL 6740174, at *2 (Iowa Ct. App. Dec. 21, 2011) ("Although the father was legally barred from visiting the child during a one-year period due

---

[1] The mother contacted police after seeing a missed call from the father. A rule to show cause that the protective order was violated was ultimately dismissed on the ground the call was an accident.

to a protective order obtained by the mother, at other times the father made efforts to establish and effectuate visitation with the child.").

Because the mother failed to prove the cited statutory ground for termination, we reverse the order terminating the father's parental rights to the child. In light of our conclusion concerning the statutory ground, we need not address the question of whether termination was in the child's best-interests. *See In re W.N.*, No. 15-0176, 2015 WL 6087624, at *3 (Iowa Ct. App. Oct. 14, 2015). Nor do we find it necessary to address any other issues raised by the parties. We remand for dismissal of the action.

**REVERSED AND REMANDED.**

Ahler, J., concurs; Buller, J. dissents.

**BULLER, Judge** (dissenting).

I dissent.  While the facts of this private termination are somewhat unusual, I would find the mother met her burden to terminate the father's parental rights on an abandonment theory.  The father's history of domestic violence is the source of all restrictions that were placed on his visitation with the child, and he took at most minimal steps toward reinitiating contact.  I would find termination is supported by the evidence and in the best interests of the child.

### I.      Background Facts and Proceedings

To understand the context of the abandonment, a more detailed discussion of the facts is warranted.  The restrictions on the father's visitation with the child were well grounded in a lengthy history of emotional abuse and domestic violence.

To quote the mother, her dating history with the father was "toxic."  It also involved rapidly escalating violence.  Within weeks of learning the mother was pregnant, the father hit the mother, chanted "abortion" at her, threatened "to push [her] down the stairs and kill [her] and the baby," and said, "he hoped that the baby would drown and die in his blood."  Throughout the pregnancy, the father threw objects at the mother, slapped and smacked her, hit her with a belt, dragged her by her hair, attempted to hit her with his car, raped her, destroyed her furniture and memorabilia while laughing, and damaged her home and outdoor decorations.

The violence and abuse persisted through the child's birth in early November 2017.  At the hospital, the father tried to limit the mother's access to her family and hit her.  He said to the newborn, "I'm sorry, [child], your mommy's a whore," and "smacked [the mother] across the face" when she asked him to stop.

Abuse continued after the child was born, whenever the mother and child visited the father:

- On Thanksgiving 2017, the father spit in the mother's face, smacked her, dragged her by her hair across a porch, and suffocated her until a family member spotted them.

- In June 2018, the father threw the mother against a hotel room wall, smacked her across the face, dragged her across the room by her hair, and hit her with his belt.

- In July 2018, again in a hotel, the father smacked the mother, pulled her hair, and hit her with his belt—all in proximity to the child.

- In October 2018, at another hotel, the father knocked the mother to the ground and struck her "so hard [her] nose was gushing with blood, [and her] eye was sealed shut." Over the next hour, the father spit on the mother, poured water on her, smacked her, pulled her hair, and called her names. The child "was screaming and crying because he was watching the entire thing." The mother later took photographs of her injuries, which depict bruises on her arms and legs, a black eye, and an injured nose.

- In October 2018, the mother reported the most recent assault to the police and the Iowa Department of Health and Human Services (HHS). The reports from the police and HHS were consistent with the mother's testimony at trial. Both entities investigated, but the police did not pursue criminal charges, and HHS determined the family did not need additional support.

- In March 2019, at yet another hotel, the father smashed the mother's phone and ripped her clothing. Hotel staff helped the mother retrieve her possessions from the room, but the father would not return the mother's purse (which contained her credit cards and driver's license).

After the March 2019 incident, the father continued to pursue the mother romantically, but she rejected him. The mother testified she did not end the relationship sooner or tell others about the abuse because she was "afraid." She also hid information from her older children and stopped them from intervening because she feared for their safety. Specifically, the father threatened to "hurt" the older children or "kick their ass" if the mother "said anything" about the abuse.

At trial, the mother explained why she was unable to recognize she was trapped in a cycle of domestic violence: "Because I was so afraid if I tried to leave him. I was so afraid of what would happen if I left. I tried many times to leave, always went back." She explained that she felt the father had isolated her from her family and friends, damaged her self-esteem, and threatened her loved ones. She also said she did not call the police earlier because she was "scared" and afraid the father would hurt her, the child at issue, or her older children.

In the same proceeding, the father repeatedly admitted to controlling, manipulative behaviors. For example, he admitted restricting whether the mother's family members could visit her at the hospital after she gave birth. He also admitted to telling the mother she should kill herself when she did not give him the parenting time that he wanted. At one point, the father used the words "controlling" and "abusive" to describe his own words and conduct toward the mother.

## II.      Course of Proceedings

A discussion of the proceedings is also necessary to understand why the district court denied the father's request to reinstate visitation, and why this limitation flows from his conduct, criminal and otherwise. Following a contested hearing, the district court placed sole legal custody and physical care with the mother and denied the father visitation "until [he] undergoes a psychiatric evaluation. The Court would consider supervised visitation upon review of such an evaluation." In so ruling, the court made the following findings of fact:

> The [mother] testified to multiple instances of serious physical abuse. Although the [father] denies the abuse, the Court finds the [mother's] testimony more credible. It is corroborated by her demeanor, by photographs, and by a police report that confirms a road-rage incident by the [father]. There is also credible evidence the [father]

has assaulted a member of his own family and that his family may not be able to protect the child from his father's anger. The [father] denies that he has an anger problem although admits to unspecified actions he is not proud of. He is willing to go to anger counseling to deal with "another person's anger." [The father] demonstrates flat affect and little emotion[], even in denying abuse. He does not deny sending some of the most vile text messages to the [mother] that this Court has ever seen. The messages confirm that he [is] capable of domestic abuse and the power and control that goes with it. In answer to a question from [the mother's] attorney, he states that the answer to whether these messages are appropriate is "complicated." The Court finds that a history of domestic abuse exists in this case that outweighs the consideration of any other factor in Iowa Code section 598.41(3) [(2021)].

The court also made additional findings on the record regarding the danger posed by the father and his failure to acknowledge his violent temper:

> You, [father], have a serious anger problem. It's interesting to me that you're willing to undergo anger management treatment but not because you have an anger problem but to deal with someone else's anger. That is very telling.
> I don't believe that your parents or [the family friend] are capable of protecting this child from a fit of rage that you might have, and I understand that you haven't hurt the child up until this time. I don't know if that's because your anger is all directed at [the mother] or if it's just by the grace of God, but we're not going to take any chances, so there's going to be no visitation at this point in time. I would reconsider that if I'm presented with a psychiatric evaluation that tells me a little more about you. But right now you are simply a danger. You're a danger to [the mother]. You're a danger to your child. You're a danger to other members of the public that are driving down the road. So without some sort of psychiatric evaluation, at least on a temporary basis there's going to be no visitation.

The orders spawned from these proceedings remained in effect through the termination trial.

### III. Discussion

I would affirm the termination of parental rights, finding the father abandoned the child under Iowa Code section 600A.8(3)(b)(1). In *In re G.A.*, we

found a father abandoned his child when contact was made more difficult by the father's criminal acts, and what we said there rings true here:

> The father must take personal responsibility for his own wrongful and criminal acts, and cannot use such acts as a justification for his lack of relationship with the child. . . . The father's own actions and decisions resulted in an extensive criminal history and the complicated circumstances that existed.

826 N.W.2d 125, 129 (Iowa Ct. App. 2012) (internal citation omitted). Similarly, in *In re K.M.*, we found abandonment when "the father's own abusive conduct towards the mother prompted the mother to take protective measures by seeking no-contact orders." No. 14-1374, 2015 WL 1849508, at *4 (Iowa Ct. App. Apr. 22, 2015).

At the May 2022 hearing, the father acknowledged having no contact with the child since September 2019 when the court denied his request for visitation. In the September 2019 order, the court was clear that it would consider allowing visitation if the father obtained a psychiatric evaluation. While the majority correctly notes that the father obtained *a* psychiatric evaluation, I agree with the district court's conclusion that the three-page report submitted to the court, following a single meeting with the father during which he "flatly denie[d]" abusing the mother, was a minimal effort "insufficient to overcome the Court's prior finding that the [father] poses a danger to his child." After this insufficient evaluation was submitted, the father had sporadic additional contact with mental-health professionals, but he made little if any effort to reinstate his parenting time through the court system despite being represented by counsel in the ongoing chapter 600B proceeding. For example, he apparently obtained another psychiatric

assessment in July 2020 but never presented it for the 600B proceeding, even though that assessment is part of the record in this action.

I share concerns expressed by the mother at trial and in her appellate brief regarding the nature and quality of the psychiatric evaluation presented to the court. The father never provided the evaluator with a complete picture of the domestic abuse or the context in which the evaluation was sought. The father has not shown any insight into why he was denied visitation, and his failure to follow recommendations for psychotherapy buttresses the juvenile court's finding on abandonment. In short, even if I gave the father the benefit of the doubt and assumed he made some effort to resume visitation, I would find this evidence is undercut by the poor quality of the assessment and overpowered by the subsequent failure to follow up and seek visitation based on additional evidence or evaluations. In my view, clear and convincing evidence of abandonment was not negated by the father's half-hearted attempt to obtain visitation with a bare-bones psychiatric evaluation. And from a policy perspective, recognizing the father's minimal efforts here may discourage other parents from seeking a protective order for fear of excusing their abusive co-parent's failure to maintain contact with their child.

I would also find termination is in the child's best interests. The father's financial contributions to the child's wellbeing, while not insignificant, are far outweighed by the danger he poses to the child—both emotionally and physically. *Cf. In re C.A.V.*, 787 N.W.2d 96, 102 (Iowa Ct. App. 2010) ("[The father's] contributions to his child's financial well-being do not overcome his complete abstention from fostering her physical, social, and emotional development."). The

father's escalating pattern of violence to the mother convinces me the child will face physical violence from the father again. And even if the father only continued to physically abuse the mother, his propensity to do so in front of the child has already inflicted (and will inflict) severe emotional harm. *See In re D.R.*, No. 15-1968, 2016 WL 1129385, at *5 (Iowa Ct. App. Mar. 23, 2016) (discussing how domestic violence harms children who witness it). Last, the father's comments directed toward the child—"your mommy's a whore," etc.—convince me that the father cannot be present in the child's life without inflicting trauma and undermining the mother. Like the juvenile court, I am convinced termination is in the best interests of the child, with particular emphasis on ensuring the child's safety from domestic violence and abuse. I would affirm.